JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
CHRISTINA TUSAN (SBN 192203)
ctusan@hammondlawpc.com
ADRIAN BARNES (SBN 253131)
abarnes@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
POLINA BRANDLER (SBN 269086)
pbrandler@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
(310) 807-1666

JASON HARROW
(Cal. Bar No. 308560)
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.
Los Angeles, CA 90016
jason@gerstein-harrow.com
(323) 744-5293

CHARLES GERSTEIN
(*pro hac vice application forthcoming*)
GERSTEIN HARROW LLP
810 7th Street NE, Suite 301
Washington, DC 20002
charlie@gerstein-harrow.com
(202) 670-4809

*Attorneys for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARI KISHORE and BRETT WALKER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>BCCL WORLDWIDE, INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br>**(1) Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 *et seq.; and***<br>**(2) Violation of the California Business & Professions Code § 17200 *et seq.* (UCL)**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

**CLASS ACTION COMPLAINT**

1

Plaintiffs Hari Kishore and Brett Walker, on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge, or, where applicable, information, belief, and the investigation of counsel:

**INTRODUCTION**

1. This case is about Defendant's unlawful disclosure of Plaintiffs' and Class Members' private information about their personal video-viewing habits and activities.

2. Federal law recognizes, through the Video Privacy Protection Act (VPPA), that our video-viewing habits are intimately private. The law accordingly requires companies that sell, rent, or offer subscriptions to prerecorded videos to maintain their customers' privacy and forbids, among other things, the knowing disclosure of customers' video choices to any third party without the customers' specific advance consent.

3. Defendant BCCL Worldwide Inc., doing business as Willow TV ("Willow" or "Defendant") sells subscriptions by which Plaintiffs and other Class Members may view prerecorded videos. Plaintiffs and other Class Members are therefore subscribers of the video services offered by Defendant as described in the Video Privacy Protection Act.

4. Despite a clear legal obligation to keep Plaintiffs' and other Class Members' video choices private, Willow chose to affirmatively disclose this information to a third party, Meta Platforms Inc. ("Meta"), without Plaintiffs' or other Class Members' knowledge or authorization. Using pieces of tracking software, including the Meta Pixel, Willow purposefully discloses its customers' viewing choices to Meta (formerly Facebook) so that Willow may more effectively profit from its users' private data. And Willow not only fails to seek specific consent to extract its users' data for profit, it affirmatively promises users that it will *not* do that, writing on its website that "[w]e do not provide any personally identifiable information to third

party websites . . . without your consent."

5. Instead of complying with the law and honoring its promises to keep its customers' information private, Willow sent the full titles of the videos that Plaintiffs and other Class Members watched on Willow to Meta alongside unique information allowing members of the public and Meta to easily identify them. Willow never sought, let alone received, Plaintiffs' or other Class Members' consent to do this. Plaintiffs accordingly bring this class action on behalf of themselves and all others similarly situated to recover actual and statutory damages against Willow for its unlawful conduct.

## PARTIES

6. Plaintiff Hari Kishore is a resident of Santa Clara County, California. In December 2022, Kishore signed up for a service that Willow describes as a "subscription" by agreeing to pay $9.99 per month in exchange for access to Willow's library of prerecorded videos. Kishore canceled his subscription in 2023.

7. Plaintiff Brett Walker is a resident of Los Angeles County, California. In 2018, Walker signed up for a service that Willow describes as a "subscription" by agreeing to pay $9.99 per month in exchange for access to Willow's library of prerecorded videos. Walker remains subscribed to Willow.

8. Defendant BCCL Worldwide Inc. is a California corporation headquartered in Redwood City, San Mateo County, California. It does business as Willow TV, a video-streaming and paid-cable service offering access to pre-recorded cricket matches.

## JURISDICTION

9. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331. This Court may exercise supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1337, and may independently exercise jurisdiction under 28 U.S.C. § 1332(d).

10. This Court has personal jurisdiction over Willow because Willow is headquartered in this jurisdiction, its principal place of business is within this District, and it has sufficient minimum contacts in California to render the exercise of jurisdiction by this Court proper and necessary.

11. Venue is proper in this Court under 28 U.S.C. § 1391(b) because Willow is headquartered in San Mateo County and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**DIVISIONAL ASSIGNMENT**

12. Pursuant to Civil L.R. 3-5(b), assignment to the Oakland or San Francisco Division is appropriate under Civil L.R. 3-2(c) and Civil L.R. 3-2(d) because Willow is headquartered in San Mateo County and a substantial part of the conduct at issue in this case occurred in San Mateo County.

**FACTUAL ALLEGATIONS**

**The Meta Pixel's Surveillance of Private Internet Activity**

13. Meta Platforms Incorporated, which operates Facebook and is accordingly the world's largest social-media company, makes almost all of its money selling targeted advertising. To target people with advertising, Meta must collect their data so that it can learn their personal characteristics and preferences. One way Meta collects peoples' data is through the Meta Pixel.[1]

14. The Meta Pixel is a piece of software code that Meta offers to websites and services, like Willow, to integrate into their websites. Meta offers the Pixel free of charge to these sites because, in order to use the Pixel, the sites agree to give Meta their users' data—in other words, in exchange for Meta's help in collecting and

---

[1] *See* FACEBOOK, *About Customer Audiences*, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited Jan. 18, 2023); FACEBOOK, *About Lookalike Audiences*, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited Jan. 18, 2023).

analyzing their users' data for targeted advertising, these websites let Meta keep their users' data and use it for any purposes Meta sees fit.

15. When a user accesses a website with a Meta Pixel installed, the Pixel—operating completely in the background, and without users' knowledge or consent—sends a message to Meta containing, at least, the user's IP address (a unique number identifying an internet user) and the fact that they interacted with the website.

16. Specifically, this message contains the content of the original request sent to the host website along with the data that host website operator configured the Meta Pixel to collect, which can include every single key stroke or mouse movement a user makes on a website.

17. Meanwhile, Meta's core business model requires that it be able to track users' activity and link it to known facts about those users. To do this, Meta uses common pieces of software called "cookies." A cookie is a small block of data created by a web server while a user is browsing a website and placed on the user's computer or the user's web browser.

18. Any time a user visits a Meta website, cookies are sent to the user's browser by which Meta can subsequently identify that specific user if they return to any Meta website. Anyone who uses Facebook or Instagram—Meta's two most popular social networks—is sent a cookie that will immediately link that user to the user's personal account.

19. Meta uses these cookies to link the information it gathers from the Pixel with Facebook and Instagram accounts. Indeed, Meta tells advertisers that it "relies on Facebook cookies, which enable [Meta] to match your website visitors to their respective Facebook User accounts," and thereby to create precise audiences to target with advertising.

20. Users with Facebook accounts are assigned a "c_user" cookie from Meta. Any person armed with a user's c_user cookie can immediately identify that user's

Facebook page by simply typing "www.facebook.com/[c-user cookie]" with that user's c_user cookie number. For example, Meta CEO Mark Zuckerberg's number is four and the URL "www.facebook.com/4" will take you to Mark Zuckerberg's Facebook page. The c_user cookie is active while users are logged in to their Facebook accounts.

21. Users with Facebook accounts are also sent cookies called "datr" and "fr" cookies. These cookies allow Meta to identify users when they are not logged in to Facebook, and at least the datr cookie is active for two years after a user was last logged in to Facebook. Although the public cannot necessarily use datr and fr cookie values to identify individual users, Meta immediately can.

22. Facebook and Instagram accounts, unsurprisingly, contain a wealth of personal information about their users, almost always including their names, photographs, and biographical information.

23. Any time Facebook users visit a website with the Pixel installed and with third-party cookies enabled on their browser, then, the website sends Meta a data packet by which the users' activity on the site is immediately personally identifiable.

24. Meanwhile, it is well known in the online-advertising industry that data about customers' video-viewing habits is quite valuable.[2]

**Willow Knowingly Sends Plaintiffs' Personal Identifying Information to Meta**

25. Willow operates a streaming video subscription service by which its users can watch cricket matches.

26. Plaintiffs and other Class Members must subscribe to Willow to watch

---

[2] *See, e.g.*, PRICE WATERHOUSE COOPERS, *After a boom year in video streaming, what comes next?*, https://www.pwc.com/us/en/services/consulting/library/consumer-intelligence-series/consumer-video-streaming-behavior.html (last accessed July 12, 2023, at 7:55 AM) (encouraging streaming services "to find ways to leverage the massive amounts of data about consumer behaviors and preferences currently generated by streaming services themselves").

videos on Willow. A basic subscription costs $9.99 per month.

27. Once subscribed to Willow, Plaintiffs and other Class Members may select from among hundreds of pre-recorded videos.

28. When Plaintiffs and Class Members select a video to watch, they are directed to a webpage hosting that specific video. As soon as the page opens, the video begins to play.

29. Each Willow webpage hosting a video uses a URL (for "uniform resource locator," which is the address of a webpage) that includes the complete title of that video, with some minor punctuation and capitalization alterations to conform to requirements for URLs.

30. For example, if a Plaintiff or Class Member selected a clip of Ajinka Rahane, of the Chennai Super Kings (CSK), scoring an impressive 27 runs against the Gujarat Titans (GT) in a Tata Indian Premier League (Tata IPL) match, she would be directed to a webpage with the URL "https://www.willow.tv/videos/*ajinkyarahane-27runs-csk-vs-gt-streaming-online-final-tata-ipl-2023-indian-premier-league*." This final, hyphenated stretch of the URL contains the title of the actual video contained on the page.

31. Every Willow video has a URL of this form—that is, one that contains the full title of the video chosen.

32. Unbeknownst to Plaintiffs and other Nationwide Class Members, Willow, using the Pixel, sends the URL, which contains the title of the videos they have watched, and more, to Meta in a data request containing information by which Meta can identify them.

33. For Plaintiffs and other Class Members who are logged in to Facebook or Instagram elsewhere on their computers while using Willow, their personal c_user cookies (which anyone can use to identify them by the name they use in real life) are also included in the request.

34. Although the URL of the video requested from Willow is sufficient to precisely identify the video, Willow *also* includes the full title of the requested video in the message it sends to Meta.

35. Willow had to specifically configure the Meta Pixel installed on its website to send this specific information—that is, the Meta Pixel is not automatically configured to send this specific information, and Meta does not add the Meta Pixel to any website without the website operator's affirmative request.

36. If a Class Member who has a Facebook account is not logged into Facebook or Instagram while using Willow, Willow sends datr and fr cookies to Meta alongside the URL and title of the video the user selected, allowing such information to be connected to that user's profile.

37. Although Meta contends that datr and fr cookies are "pseudo-anonymous," in fact they allow Meta to easily identify Plaintiffs and other Class Members with accounts. Indeed, Meta uses these cookies so that users who are logged out of their Facebook accounts are connected to their accounts when they return to Facebook so that they may more easily log in.

38. In short, Willow sends the full title of the videos Plaintiffs and other Class Members watch to Meta alongside information that allows Meta to identify any of the viewers who also have accounts with Meta, including people who have Facebook accounts.

### Plaintiffs' Experience With Willow

39. Hari Kishore first subscribed to Willow in 2021 by signing up for a service that Willow describes as a "subscription" and paying $9.99 per month for access to Willow's library of videos. In 2022, he watched approximately 20 videos on Willow. Because his favorite team—India's national team—often plays in the middle of the night California time, he often watches prerecorded matches, in addition to highlights of other past matches. Kishore has a Facebook account. Kishore canceled

his Willow subscription in 2023.

40. Brett Walker first subscribed to Willow in 2018 by signing up for a service that Willow describes as a "subscription" and paying $9.99 per month for access to Willow's library of videos. He watches at least 100 and often as many as 400 cricket matches per year. Because his favorite team—Australia's national team—often plays in the middle of the night California time, he often watches pre-recorded matches, in addition to highlights of other matches in which he is less interested. Walker has a Facebook account. Walker has continuously subscribed to Willow since 2018 and remains subscribed today.

## TOLLING OF THE STATUTES OF LIMITATIONS

41. All applicable statutes of limitations have been tolled by Willow's knowing and active concealment and denial of facts alleged herein. Plaintiffs and other Class Members could not have reasonably discovered Willow's practices of sharing their personal video-viewing habits and activities and PII with Meta until shortly before this class action litigation commenced.

42. Willow was and remains under a continuing duty to disclose to Plaintiffs and other Class Members its practice of sharing personal video-viewing habits and activities alongside personally identifiable information to Meta. As a result of the active concealment by Willow, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## CLASS ACTION ALLEGATIONS

43. Plaintiffs propose to certify the following class (members of which are collectively referred to herein as "Class Members"):

**Nationwide Class:** All persons in the United States who subscribed to Willow and, while having a Facebook account, viewed prerecorded video content on www.willow.tv during the time the Meta Pixel was active on www.willow.tv.

**California Subclass**: All persons in California who subscribed to Willow and, while having a Facebook account, viewed prerecorded video content on www.willow.tv during the time the Meta Pixel was active on www.willow.tv.

44. Excluded from the Class are Defendant, its employees, agents and assigns, and any members of the judiciary to whom this case is assigned, their respective court staff, the members of their immediate families, and Plaintiffs' counsel. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

45. This class easily satisfies the requirements of Federal Rule of Civil Procedure 23 for the certification of a class action, known respectively as numerosity, commonality, typicality, adequacy, predominance, and superiority. Although ascertainability is not a separate requirement of class actions, this class is in fact easily ascertainable.

46. First, there are hundreds of thousands of Willow subscribers whose privacy rights Willow has violated. Numerosity is beyond dispute here.

47. Second, common questions of fact and law abound in this matter, including, but not limited to: whether Willow's use of the Meta Pixel was without the consent of Class Members; whether Willow acted with scienter in this matter; and, whether the information sent to Meta was "personally identifiable."

48. Third, Plaintiffs' claims are typical of those of the Class Members: Plaintiffs watched pre-recorded videos on www.willow.tv, and Plaintiffs have Facebook accounts, which are the exact circumstances of all class members.

49. Fourth, Plaintiffs will adequately represent the class in this matter because they have no known conflicts of interest with other Class Members, because their claims are typical of those of the class, and because they will vigorously and diligently prosecute this matter. Plaintiffs' choice of class counsel, Hammond Law PC and Gerstein Harrow LLP, are all experienced class action and consumer protection

practitioners who will adequately protect the interests of absent Class Members.

50. Fifth, common questions predominate over individual ones in this matter. All Class Members suffered the exact same privacy violation, and so liability will be determined for each on a wholly class-wide basis. And because the VRPA provides $2,500 in statutory damages for each aggrieved class member, individual damages calculations are extremely unlikely.

51. Sixth, a class action is a superior way—indeed the only practical way—to proceed in this matter. There are hundreds of thousands of Willow subscribers, each with identical claims, and there are no practical obstacles to noticing them, determining whether Willow violated their privacy rights, and proceeding on their behalf as a class. Forcing each to proceed individually, on the other hand, would be impractical and a severe waste of judicial resources.

52. Finally, although this is not a standalone requirement, this class is easily ascertainable. Meta maintains records by which it can easily identify which of its users accessed which videos on Willow, through c_user cookies, fr and datr cookies. Willow similarly has access to this information. Through the service of straightforward discovery requests and subpoenas for records, Plaintiffs will be able to ascertain the Facebook profile, name, and billing address of each and every member of the class and, therefore, will be able easily to provide them with notice of this action.

## FIRST CAUSE OF ACTION

*Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq.*

*[On Behalf of Plaintiffs and Nationwide Class Members]*

53. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

54. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third

party without the "informed, written consent . . . of the consumer" and the opportunity to opt out of disclosures. *See generally* 18 U.S.C. § 2710.

55. Willow is "video tape service provider" because it is "engaged in the business, in or affecting interstate commerce, of . . . delivery of prerecorded . . . audiovisual materials." 18 U.S.C. § 2710(a)(4).

56. Plaintiffs and Class Members are "consumers" because they are "subscribers" to Willow's services, each having agreed to pay $9.99 per month to access Willow's library of pre-recorded videos, a service Willow describes as a "subscription." 18 U.S.C. § 2710(a)(1).

57. Willow discloses "personally identifiable information" of Plaintiffs and other Class Members to Meta because Willow sends "information which identifies a person as having requested or obtained specific video materials" from Willow, 18 U.S.C. § 2710(a)(3), specifically the URL and full title of every video watched alongside information that would allow any member of the public, or at least the recipients of the information Willow sends, to identify the user.

58. Willow does not seek, let alone get, "informed, written consent" from Plaintiffs and other Class Members, 18 U.S.C. § 2710(b)(2), and it never provides them the opportunity to opt out, 18 U.S.C. § 2710(b)(2)(iii).

59. Willow provided PII to Meta knowingly: Willow installed the Meta Pixel, which advertises its ability to link user activity to Facebook accounts, on its website and configured the Pixel specifically to gather and disclose to Meta the full title of the videos Plaintiffs and Class Members watched.

60. By knowingly disclosing Plaintiffs' and other Class Members' personal viewing content, Willow violated Plaintiffs' and other Class Members' statutorily protected right to privacy in their video-viewing habits and activities. *See* 18 U.S.C. § 2710(c).

61. As a result of the above-described violations, Willow is liable to Plaintiffs

and other Class Members for actual damages in an amount to be determined at trial or, alternatively, for "liquidated damages not less than $2,500 per plaintiff." 18 U.S.C. § 2710(c)(2)(A). Under the Act, Willow is also liable for reasonable attorneys' fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by Willow in the future.

62. Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

## SECOND CAUSE OF ACTION

*Violation of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200, et seq.*

*[On Behalf of Plaintiffs and Nationwide Class Members, or, in the Alternative, on Behalf of Plaintiffs and California Subclass Members]*

63. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

64. A nationwide class applying California law is appropriate given that Willow's "Terms and Conditions" contain a California choice of law provision, and Willow is headquartered in California, has its principal place of business in California, and its misconduct, as alleged in this Complaint, originated in California. Thus, California has significant contact, or a significant aggregation of contacts, to the claims asserted by Plaintiffs and other Class Members, thereby creating state interests to ensure that the choice of California state law is not arbitrary or unfair.

65. The application of California laws to the Nationwide Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the proposed Nationwide Class, and California has a greater interest in applying its laws here than any other interested state.

66. The UCL prohibits unfair competition in the form of any unlawful,

unfair, or fraudulent business act or practice. California Business & Professions Code § 17204 allows "any person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Such a person may bring such an action on behalf of themselves and others similarly situated, who are affected by the unlawful, unfair, or fraudulent business practice or practices.

67. Defendant's acts, omissions, practices, and non-disclosures as alleged herein constituted unlawful, unfair, and fraudulent business acts and practices within the meaning of Cal. Bus. & Prof. Code § 17200, et seq.

68. Defendant's business acts and practices are unlawful because they violate the Video Privacy Protection Act, 18 U.S.C. § 2701, et seq. as set forth in this complaint, including in more detail in paragraphs 53–62.

69. Defendant's acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. Defendant secretly disclosed, released, and otherwise misused Plaintiffs' and other Class Members' video viewing information, with no corresponding benefit to its affected customers and other website visitors. And, because consumers were unaware of Defendant's incorporation of tracking tools into its website and that Defendant would disclose and release their video viewing information to unauthorized third parties, they could not have avoided the harm.

70. The UCL also prohibits any "fraudulent business act or practice."

71. Defendant's above-described nondisclosures and misleading statements that users' information would be kept private were false, misleading, and likely to deceive the consuming public in violation of the fraudulent prong of the UCL. Defendant engaged in such fraudulent acts and practices when it: failed to make the above-described nondisclosures; disclosed Plaintiffs' and Class Members' video viewing practices to Meta without notice or consent; and, made misleading statements including but not limited to its assertions that it would not market,

disclose, or allow third parties access to patients' video viewing Information. These statements, non-disclosures, and other acts and practices were false, misleading, and likely to deceive the consuming public in violation of the UCL.

72. Defendant should be required to cease its unfair and/or illegal disclosure of user data. Defendant reaped unjust profits and revenues in violation of the UCL.

73. Plaintiffs and other Class Members also suffered injury in fact as a result of Defendant's acts and practices because they paid more for Defendant's services than they otherwise would have had they known Defendant was disclosing its video viewing information to unauthorized third parties in violation of its legal obligations, social norms, own statements on its website, and reasonable consumer expectations.

74. Plaintiffs seek a declaration from the Court that Defendant's conduct alleged herein constitutes a violation of Bus. & Prof. Code §§ 17200 *et seq*. under the unlawful, unfair, and fraudulent prongs of the UCL.

75. Plaintiffs also seek restitution on behalf of themselves and Class Members.

76. Plaintiffs and other Class Members lack an adequate remedy at law because the ongoing harms from Defendant's collection and disclosure of their information must be addressed by injunctive relief and, due to the ongoing and nature of the harm, the harm cannot be adequately addressed by monetary damages alone.

77. This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiffs in relation to Plaintiffs' respective stakes in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiffs also seek the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and

other applicable law.

78. Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

### PRAYER FOR RELIEF

Plaintiffs on behalf of themselves and other Class Members pray for judgment against Defendant as follows:

79. An order certifying the Class as requested herein;

80. An order appointing Plaintiffs Hari Kishore and Brett Walker as Class Representatives;

81. An order appointing the undersigned attorneys as Class Counsel;

82. An order awarding Plaintiffs and Class Members statutory damages of no less than $2,500 per class member per violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq.;

83. An injunction forbidding Defendant from disclosing information about users' video viewing choices to third parties pursuant to 18 U.S.C. § 2710(c)(2)(D);

84. Pursuant to Business and Professions Code section 17203, an order that Defendant, its successors, agents, representatives, employees, and all persons who act in concert with it be permanently enjoined from committing any acts of unfair competition as defined in Business and Professions Code §§ 17200 *et seq.*, including, but not limited to, the acts and practices alleged in this Complaint;

85. Such orders or judgments as may be necessary to prevent the use or employment by Defendant of any practice that constitutes unfair competition, under the authority of Business and Professions Code § 17203;

86. An order restoring to Plaintiffs and other Class Members any money and property acquired by Defendant through its wrongful conduct;

87. An award of reasonable attorneys' fees and costs of suit, including costs of investigation;

88. An award of pre- and post-judgment interest as provided by law; and

89. An award of such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and other members of the Class hereby demand a jury trial on all issues so triable.

Dated: July 20, 2023                    Respectfully submitted,

*/s/ Julian Hammond*
JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
CHRISTINA TUSAN (SBN 192203)
ctusan@hammondlawpc.com
ADRIAN BARNES (SBN 253131)
abarnes@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
POLINA BRANDLER (SBN 269086)
pbrandler@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
(310) 807-1666

*/s/ Jason Harrow*
Jason Harrow
(Cal. Bar No. 308560)
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.
Los Angeles, CA 90016
jason@gerstein-harrow.com
(323) 744-5293

Charles Gerstein
(*pro hac vice application forthcoming*)
GERSTEIN HARROW LLP
810 7th Street NE, Suite 301
Washington, DC 20002
charlie@gerstein-harrow.com
(202) 670-4809

*Attorneys for Plaintiffs*